# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| STATE OF MISSOURI, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) No. 4:21-cv-376 |
| | ) |
| JANET YELLEN, in her official capacity as | ) **ORAL ARGUMENT NOT** |
| Secretary of the Treasury; RICHARD DELMAR, | ) **REQUESTED** |
| in his official capacity as acting inspector | ) |
| general of the Department of the Treasury; | ) |
| and U.S. DEPARTMENT OF THE TREASURY, | ) |
| | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

## BRIEF FOR *AMICI CURIAE*
## CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AND NATIONAL FEDERATION OF INDEPENDENT BUSINESS SMALL BUSINESS LEGAL CENTER

DARYL JOSEFFER #457185DC
PAUL LETTOW #502440DC
U.S. CHAMBER LITIGATION CENTER
1615 H Street NW
Washington, DC 20062
(202) 463-5337

KAREN HARNED #456803DC
ROB SMITH #84259MI
NFIB SMALL BUSINESS LEGAL CENTER
1201 F Street NW #200
Washington, DC 20004
(202) 314-2061

PAUL D. CLEMENT, #37915VA
ERIN E. MURPHY, #995953DC
KASDIN M. MITCHELL, #1602380DC
LAURA E. WOLK, #1643193DC
ELIZABETH HEDGES, #1657707DC
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
Washington, DC 20004
(202) 389-5000

April 15, 2021

## CORPORATE DISCLOSURE STATEMENT

The Chamber of Commerce of the United States of America is a nonprofit, tax-exempt organization incorporated in the District of Columbia.  The National Federation of Independent Business Small Business Legal Center is a 501(c)(3) public interest law firm and is affiliated with the National Federation of Independent Business, a 501(c)(6) business association.  Neither the Chamber of Commerce of the United States of America nor the National Federation of Independent Business has a parent corporation, nor does any publicly held corporation own 10% or more of their stock.  No publicly held corporation or its affiliate that is not a party to this case or appearing *amici curiae* has a substantial financial interest in the outcome of this litigation by reason of insurance, a franchise agreement, or an indemnity agreement.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ............................................................... i

STATEMENT OF INTEREST.................................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................... 2

ARGUMENT ........................................................................................................... 3

I.      The Tax Mandate Is An Unconstitutional Incursion On A Core Attribute Of State Sovereignty And An Impermissibly Coercive Condition On Federal Funds
        ...................................................................................................................... 5

II.     Left Standing, The Tax Mandate Will Have Dire Consequences .................... 10

CONCLUSION........................................................................................................ 15

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
  548 U.S. 291 (2006)................................................................................................ 14

*Bode v. Barrett*,
  344 U.S. 583 (1953).................................................................................................. 5

*Bond v. United States*,
  564 U.S. 211 (2011).................................................................................................. 6

*Coyle v. Smith*,
  221 U.S. 559 (1911).................................................................................................. 6

*Dep't of Revenue v. ACF Indus., Inc.*,
  510 U.S. 332 (1994).................................................................................................. 5

*Dows v. City of Chicago*,
  78 U.S. (11 Wall.) 108 (1870)............................................................................... 5, 11

*Free Enter. Fund v. PCAOB*,
  561 U.S. 477 (2010).................................................................................................. 7

*M'Culloch v. Maryland*,
  17 U.S. (4 Wheat.) 316 (1819)................................................................................. 5

*National Federation of Independent Business v. Sebelius*,
  567 U.S. 519 (2012).............................................................................................. 2, 8, 9

*New York v. United States*,
  505 U.S. 144 (1992).................................................................................................. 8

*Plaut v. Spendthrift Farm, Inc.*,
  514 U.S. 211 (1995).................................................................................................. 7

*Providence Bank v. Billings*,
  29 U.S. (4 Pet.) 514 (1830)...................................................................................... 5, 6

*South Dakota v. Dole*,
  483 U.S. 203 (1987).............................................................................................. 3, 14

*Steward Mach. Co. v. Davis*,
  301 U.S. 548 (1937).................................................................................................. 8

**Constitutional Provisions**

U.S. Const. Art. I, §10................................................................................................ 5

U.S. Const. Art. I, §8, cl. 1 ............................................................................... 5

U.S. Const. Art. I, §9 ....................................................................................... 5

U.S. Const. Amend. XVI .............................................................................. 5, 6

**Legislative Materials**

H.B. 1071, 112th Gen. Assemb., Reg. Sess. (Tenn. 2021)......................... 12

H.B. 114, 156th Gen. Assemb., Reg. Sess. (Ga. 2021) ............................. 13

H.B. 1406, 101st Gen. Assemb., Reg. Sess. (Mo. 2021) ........................... 12

H.B. 227, 2021 Leg., Reg. Sess. (Ala. 2021) ............................................ 13

H.B. 279, 67th Leg., Reg. Sess. (Mont. 2021) .......................................... 13

H.B. 429, 101st Gen. Assemb., 1st Reg. Sess. (Mo. 2021)........................ 13

S.B. 1, 55th Leg., 1st Sess. (N.M. 2021) ..............................................11, 12

S.B. 101, 2021 Gen. Ct., Reg. Sess. (N.H. 2021) ..................................... 12

S.B. 149, 2021 Gen. Assemb., Reg. Sess. (Kan. 2021) .............................11

S.B. 372, 87th Leg., Reg. Sess. (Tex. 2021) ............................................. 12

S.B. 446, 85th Gen. Assemb., Reg. Sess. (W. Va. 2021) .......................... 13

S.B. 496, 442d Gen. Assemb., Reg. Sess. (Md. 2021)...............................11

Pub. L. No. 117-2 ................................................................................. 2, 4, 15

**Other Authorities**

Alex Sherman,
*Five Charts That Show How COVID-19 Stopped the*
*U.S. Economy In Its Tracks*, CNBC (Mar. 11, 2021),
https://cnb.cx/3cZ97O0 ............................................................. 9

Anne Sraders & Lance Lambert,
*COVID Business: Nearly 100,000 Establishments That*
*Temporarily Shut Down Are Now Out of Business*,
Fortune (Sept. 28, 2020), https://bit.ly/3t6dpci ..................... 10

Anshu Siripurapu & Jonathan Masters,
*How COVID-19 Is Harming State and City Budgets*,

Council on Foreign Relations (Mar. 19, 2021),
https://on.cfr.org/3f9vjqm ........................................................................ 10

Associated Press,
*New Mexico To Issue $600 One-Time Tax Rebates Amid Pandemic*
(Mar. 24, 2021), https://bit.ly/320cJJv ..................................................... 12

*City of Phila. v. Sessions*,
280 F. Supp. 3d 579 (E.D. Pa. 2017) ....................................................... 15

Complaint,
*Arizona v. Yellen*,
No. 2:21-cv-00514-DJH (filed Mar. 25, 2021) .......................................... 8

Erin Huffer & Aravind Boddupalli,
*The Leisure & Hospitality Sector Has an Employment Crisis—*
*and It Might Be Getting Worse*, Urban Wire (July 20, 2020),
https://urbn.is/397ptlz .............................................................................. 9

Hearing on CARES Act Quarterly Report,
Sen. Banking, Hous. & Urb. Affairs Comm. (Mar. 24, 2021) ................. 13

Holly Wade & Andrew Heritage,
*Small Business Problems & Priorities 2020*,
NFIB Research Center (July 2020), https://bit.ly/3wpWt2g ................... 12

*How the COVID-19 Pandemic is Transforming State Budgets*,
Urban Institute (Apr. 2, 2021), https://urbn.is/3cAJjrj............................. 9

Jared Walczak,
*Four Questions Treasury Must Answer About*
*the State Tax Cut Prohibition in the American Rescue Plan Act*,
Tax Foundation (Mar. 18, 2021), https://bit.ly/3cYu0YB ........................ 8

Laura Davison,
*Treasury Clears States to Cut Taxes – But Not With Stimulus*,
Bloomberg (March 18, 2021), https://bloom.bg/3wFsTpH ............... 4, 13

Letter from Janet L. Yellen to 21 State Attorneys General
(Mar. 23, 2021), https://bit.ly/3sEwBO9 ................................................. 5

Letter from Janet Yellen to Hon. Mark Brnovich,
Attorney General (Mar. 23, 2021)............................................................ 13

Lucy Dadayan,
*COVID-19 Pandemic Could Slash 2020-21 State Revenues by*
*$200 Billion*, Tax Policy Center (Jul. 1, 2020),
https://tpc.io/2NKE8M5............................................................................ 10

Nat'l Ass'n of State Budget Officers, *Budget Processes in the States*
(2015), https://bit.ly/3dNTfNR .................................................................... 14

Nat'l Restaurant Ass'n,
*Restaurant Sales Fell to Their Lowest Level Since June*
(Jan. 15, 2021), https://bit.ly/3d5gVwu ........................................................ 9

Nat'l Restaurant Ass'n, *Restaurant Employment Fell for
the Third Consecutive Month* (Feb. 5, 2021),
https://bit.ly/31b0pG3 ..................................................................................... 9

NFIB Research Center,
*Covid-19 Small Business Survey (16)*
(Mar. 16, 2021), https://bit.ly/3dv5COz ........................................................ 9

Office of Gov. Gavin Newsom,
*Governor Newsom Signs Legislative Package Providing Urgent
Relief to Californians Experiencing Pandemic Hardship*
(Feb. 23, 2021), https://bit.ly/2Q6wXOU ................................................... 11

Office of Governor Larry Hogan,
The RELIEF Act of 2021, https://bit.ly/2O6yoMG ................................... 12

Oxford Economic Analysis, *State-by-State Job Loss:
COVID Continues to Devastate Hotel Industry*,
Am. Hotel & Lodging Ass'n (Feb. 2021), https://bit.ly/3uG0H47 ....................... 10

Patrick Gleason,
*How Senator Joe Manchin's Move To Block Tax Relief
in His Own State Costs All U.S. Taxpayers*,
Forbes (Mar. 16, 2021), https://bit.ly/31vV782 ......................................... 15

Press Release, *President Biden Announces American Rescue Plan*,
White House (Jan. 20, 2021), https://bit.ly/3f4S5Qe ................................... 15

Press Release, *Statement on State Fiscal Recovery Funds and Tax
Conformity*, U.S. Dep't of Treasury (Apr. 7, 2021) ................................... 13

*State Economic Monitor*
(Mar. 26, 2021), https://urbn.is/3d1hsj3 ..................................................... 10

*Tennessee Bill Would Exempt Groceries from Sales Tax
for May Through October 2021*, WBIR (Mar. 18, 2021),
https://bit.ly/39tL2wU ................................................................................. 12

Vanessa Romo et al.,
*Tornadoes Strike Alabama, Georgia Leaving at Least 5 Dead*,
NPR (Mar. 26, 2021), https://n.pr/2PpDZ1f .............................................. 14

**STATEMENT OF INTEREST**

Founded in 1912, the Chamber of Commerce of the United States of America (the "Chamber") is the world's largest business federation.  It represents approximately 300,000 members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every economic sector, and from every region of the country.  An important function of the Chamber is to represent the interests of its members by participating as a litigant or *amicus curiae* in cases involving issues of concern to American businesses, such as this one.

The National Federation of Independent Business ("NFIB") is the Nation's leading small business association.  Its membership spans the spectrum of business operations, ranging from sole proprietor enterprises to firms with hundreds of employees.  Founded in 1943 as a nonprofit, nonpartisan organization, NFIB's mission is to promote and protect the right of its members to own, operate, and grow their businesses.  The NFIB Small Business Legal Center is a nonprofit, public interest law firm established to provide legal resources and be the voice for small businesses in the Nation's courts through representation on issues of public interest affecting small businesses.  To fulfill its role as the voice for small business, the Legal Center frequently files *amicus* briefs in cases that will impact small businesses.

*Amici* have a strong interest in this case, as the tax mandate poses a grave threat both to structural principles of federalism and separation of powers that have well-served the Nation and to the economic well-being of U.S. businesses.  *Amici* are concerned that the tax mandate will hobble States that seek to ease tax burdens on businesses of all sizes and industries that have been substantially harmed at no fault of their own, but due to closures and other restrictions imposed on them due to the pandemic.  The tax mandate will undoubtedly stifle innovation in the States by limiting their options to support economic activity, which are critical to their businesses' economic

recovery and to the well-being of businesses and their employees.  For these reasons and others described below, *amici* respectfully urge this Court to grant Missouri's request for a preliminary injunction.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

The novel tax mandate at the heart of this case is unprecedented and unconstitutional. Never before in the history of the Republic has the federal government conditioned the receipt of federal funds on a State's surrender of its power to control its own tax policies.  It is beyond question that Congress cannot dictate state tax policy directly, and such an intrusion into core matters of state sovereignty is ultra vires even as a condition on federal funds.  Congress has resisted the temptation to impose such a condition for over two centuries not out of uncharacteristic self-restraint, but because the power to impose such conditions is lacking.  But at bare minimum, Congress cannot coerce States into surrendering such a core aspect of sovereignty with an offer they cannot refuse—a massive federal relief package ultimately funded by taxpayers.

In the American Rescue Plan Act of 2021 (ARPA), Congress has made $195.3 billion in taxpayer dollars—i.e., money collected from the States' citizens—available to States if and only if States agree not to pass any laws or take any administrative actions that decrease their net revenue, whether that decrease comes through tax credits, rebates, reductions in tax rates, or new or expanded deductions.  Pub. L. No. 117-2, §9901(b)(3)(A).  For most States, the massive amount of funds available under ARPA—nearly 20% of state government revenues nationwide—eclipses even the massive volume of Medicaid funding held to be coercive under *National Federation of Independent Business v. Sebelius* ("*NFIB*"), 567 U.S. 519, 581-82, 588 (2012).  And the coercion

---

[1]   No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amici curiae*, their members, and their counsel, made any monetary contribution toward the preparation or submission of this brief.

is even more acute here given that the entire point of ARPA is to help alleviate the effects of a once-in-a-lifetime global pandemic that has left some States and many of their residents in financial ruin.  The notion that a State could refuse such a massive amount of federal relief money raised from its own taxpaying citizenry in these extraordinary times is fanciful.  In effect, then, Congress has commandeered the tax power of the States—something that Congress plainly lacks the power to do.

The unprecedented tax mandate is already eroding state sovereignty, and it will continue to do so unless and until this Court enjoins it.  While the federal government tries to sort out the precise metes and bounds of its trespass on state sovereignty (a constitutional problem in its own right, *see South Dakota v. Dole*, 483 U.S. 203, 207 (1987)), state lawmakers are left with little choice but to halt critical public policy measures that implicate their fiscs.  Those measures range from tax credits for families, to sales tax exemptions for groceries, to natural disaster relief, and more.  With States forced to put these policies on hold out of fear that they will threaten their federal relief, there can be no question that the States and their citizens are suffering irreparable injury right now.  Any contrary federal interest is minimal, if not entirely ultra vires.  The Court should promptly enjoin this unprecedented and patently unconstitutional prohibition.

## ARGUMENT

ARPA offers approximately $195 billion to States in an effort to aid the States' and their residents' financial recovery from the COVID-19 pandemic.  Like most spending power legislation, the Act expressly enumerates the purposes to which States may put those funds.  States may use the money to: (a) "respond to the public health emergency with respect to [COVID-19] or its negative economic impacts, including assistance to households, small businesses, and nonprofits, or aid to impacted industries such as tourism, travel, and hospitality"; (b) "respond to workers performing essential work" during the pandemic by providing premium pay or grants;

3

(c) provide government services "to the extent of the reduction" in local revenue "due to [COVID-19] relative to revenues collected in the most recent full fiscal year … prior to the emergency"; and (d) "make necessary investments in water, sewer, or broadband infrastructure." Pub. L. No. 117-2, §9901(c)(1)(A)-(D).

In addition to those conditions, the Act includes a section titled "further restriction" on the "use of funds." *Id.* §9901(c)(2) (capitalization altered). One such restriction provides:

> A State or territory shall not use the funds provided under this section or transferred pursuant to section 603(c)(4) to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

*Id.* §9901(c)(2)(A). If a State violates that prohibition, it must repay the funds in "an amount equal to the amount of funds used in violation" of the Act. *Id.* §9901(e). The Act also prohibits States from using the funds for "deposit into any pension fund." *Id.* §9901(c)(2)(B).

By its terms, the tax mandate is breathtakingly broad. By prohibiting the relief funds from even "indirectly" offsetting a decrease in state revenue, the provision appears to reach *any* "law, regulation, or administrative action" that effects a reduction in rate, rebate, deduction, or credit, regardless of whether any federal funds received were used to finance that tax measure. By its terms, it would appear to preclude any state revenue official from adopting any pro-taxpayer interpretation of a disputed provision. The prohibition even goes so far as to forbid a State to delay the imposition of a tax or tax increase, even as a hardship allowance for the crippling financial consequences of the pandemic.

The Treasury Department has indicated that the prohibition may reach only tax cuts that are specifically paid for with relief funds. *See* Laura Davison, *Treasury Clears States to Cut Taxes – But Not With Stimulus*, Bloomberg (March 18, 2021), https://bloom.bg/3wFsTpH; Letter from

Janet L. Yellen to 21 State Attorneys General (Mar. 23, 2021), https://bit.ly/3sEwBO9.  But those one-off (and nonbinding) statements are in tension with the plain text (not to mention the fungible nature of money), and they provide cold comfort to state lawmakers, many of whom are in the middle of their time-limited legislative sessions now.  Moreover, the only thing worse than an unprecedented intrusion into state sovereignty is confusion over the extent of the federal intrusion.  The only proper judicial course, while the executive contemplates the degree of congressionally authorized intrusion, is to enjoin the provision.

**I.**     **The Tax Mandate Is An Unconstitutional Incursion On A Core Attribute Of State Sovereignty And An Impermissibly Coercive Condition On Federal Funds.**

The power to tax or not to tax lies at the absolute core of sovereignty.  Misguided taxes spurred the revolution that produced our Republic.  Our founding document includes multiple specifications of what both federal and state governments can and cannot tax.  U.S. Const. Art. I, §8, cl. 1; *id.* Art. I, §9, cl. 1, 4, 5; *id.* Art. I, §10, cl. 2; *id.* Amend. XVI.  And our earliest and greatest judicial decisions recognize that "the power to tax involves the power to destroy." *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 431 (1819).

It is no surprise that the Supreme Court has recognized that the power to tax is "central to state sovereignty." *Dep't of Revenue v. ACF Indus., Inc.*, 510 U.S. 332, 345 (1994); *see also, e.g.*, *Bode v. Barrett*, 344 U.S. 583, 585 (1953).  Indeed, the "power to regulate the public revenue" is "necessary" to a State's "very existence," for the "power of self government … cannot exist distinct from the power of taxation," *Providence Bank v. Billings*, 29 U.S. (4 Pet.) 514, 546, 548 (1830), which is the principal way in which a State "obtain[s] the means to carry on [its] respective government[]," *Dows v. City of Chicago*, 78 U.S. (11 Wall.) 108, 110 (1870).  Thus, it has been settled law from the earliest days of the Republic that a State "alone" may, "within its own jurisdiction," "judge and determine how, in what manner, and upon what objects that power shall

be exercised." *Billings*, 29 U.S. at 544.  Simply put, it is difficult to conceive of a greater threat to the "integrity, dignity, and residual sovereignty of the States," *Bond v. United States*, 564 U.S. 211, 221 (2011), than the loss of their sovereign right to decide whether and how much to tax their citizens.

If anything, that core attribute of state sovereignty has taken on even greater importance in the wake of the Sixteenth Amendment, which empowers the federal government to tax the income of the States' citizenry.  *See* U.S. Const. Amend. XVI.  Taxing citizens is a zero-sum game.  No matter how many sovereigns tax them, citizens cannot be taxed more than 100%, and they begin avoiding taxable activity at far lower rates.  That makes the States' power to set their own tax policy in the shadow of the Sixteenth Amendment critical not only to their ability to sustain their own governments, but also to serve as a check on the federal government's own taxing power. States may not be able to stop the federal government from taxing the income their citizens produce.  But at least States can try to alleviate the burden on their citizens by reducing their own reliance on tax revenues, especially when the federal government uses the tax revenues it collects from their citizenry to insert itself into functions traditionally left to the States (or even more perversely, redistributes federal tax revenues to States to spend on matters of traditional state concern).  The States' ability to play this safety-valve role is critical to preserving the framers' vision that a system of dual-sovereignty would enhance, rather than threaten, individual liberty. *See Bond*, 564 U.S. at 221.

Those bedrock tenets of federalism should suffice to resolve this case.  Some matters are simply too close to the core of state sovereignty for the federal government to dictate their terms, even if the terms are framed as conditions.  *See, e.g.*, *Coyle v. Smith*, 221 U.S. 559, 577 (1911) (holding unconstitutional effort to prevent Oklahoma from relocating its capitol as a condition of

its admission to the Union).  Just as it is not for the federal government to decide where a State should locate its capitol, it is not for the federal government to decide whether a State should lower or raise taxes.  That Congress has purported to do so here as a condition on the receipt of federal funds (or, more aptly, federal tax revenues collected from the States' own citizens) makes no difference.  As *Coyle* recognizes, some conditions reach so deeply into the core of state sovereignty that they are simply ultra vires even as conditions on funds.

That is clearly true of this unprecedented effort to dictate state tax policy.  If the power to tax is indeed the power to destroy, then the federal government has no more business dictating what state governments may and may not tax than States have in taxing federal instrumentalities.  If Congress determined that state income taxes were an impediment to federal-income-tax collection, it could not force States out of the income-tax enterprise either directly or indirectly as a condition of a tranche of federal funds.  Indeed, where the Constitution puts certain revenue sources off-limits to States, it does so directly, as with Article I, Section 10's express prohibition on state taxes on imports and exports without Congress' consent.  The idea that Congress itself could add another clause to Article I, Section 10, either directly or as a condition of federal funding, should be a non-starter.  That likely explains why Congress has never before taken that extraordinary step of trying to dictate the States' taxing policy—itself a sure sign that Congress lacks the power to do so.  *Cf. Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 230 (1995) (Congress' "prolonged reticence would be amazing if such interference were not understood to be constitutionally proscribed"); *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 505 (2010) ("Perhaps the most telling indication of the severe constitutional problem … is the lack of historical precedent ….").

7

In fact, ARPA's tax mandate is unconstitutional twice over, for it suffers from the additional infirmity that it is impermissibly coercive.  As the Supreme Court reaffirmed in *NFIB*, when Congress offers federal funds to States on the condition that they enact or refrain from enacting certain policies, the condition is permissible only if the offer is voluntary not just in theory, but in fact.  *See* 567 U.S. at 577.  That limitation is critical because, "[n]o matter how powerful the federal interest involved, the Constitution simply does not give Congress the authority to require the States to regulate."  *New York v. United States*, 505 U.S. 144, 181-82 (1992).  By effectively circumventing that rule, efforts to use the power of the federal purse to coerce States to do Congress' bidding "undermine the status of the States as independent sovereigns in our federal system."  *NFIB*, 567 U.S. at 577.  It is thus incumbent on courts to carefully "scrutinize" spending legislation to ensure that Congress is "not using financial inducements to exert a 'power akin to undue influence'" on the States.  *Id.* (quoting *Steward Mach. Co. v. Davis*, 301 U.S. 548, 590 (1937)).  Federal "pressure turns into compulsion" when States no longer have a "legitimate choice whether to accept the federal conditions in exchange for federal funds."  *Id.* at 577, 643.

There can be no serious question that ARPA is coercive.  In *NFIB*, the threatened "loss of over 10 percent of a State's overall budget" was "surely beyond" the constitutional line.  *Id.* at 582, 585.  Here, the $195.3 billion available to States and the District of Columbia eclipses that by any measure.  It is equivalent to a whopping *20%* of the annual state tax collections of state governments.  Jared Walczak, *Four Questions Treasury Must Answer About the State Tax Cut Prohibition in the American Rescue Plan Act*, Tax Foundation (Mar. 18, 2021), https://bit.ly/3cYu0YB.  For some States, the impact is even greater.  The money available to Arizona, for instance, is equivalent to about 40% of its general fund budget.  *See* Complaint ¶11, *Arizona v. Yellen*, No. 2:21-cv-00514-DJH (filed Mar. 25, 2021).  And in Mississippi, it is nearly

30% of its 2021 budget.  *How the COVID-19 Pandemic is Transforming State Budgets*, Urban Institute (Apr. 2, 2021), https://urbn.is/3cAJjrj.  As in *NFIB*, the sheer amount of money at issue "leaves the States with no real option but to acquiesce."  567 U.S. at 582.

And numbers alone do not tell the whole story.  Over the past year, the COVID-19 pandemic has forced the whole world to endure extreme economic hardship.  Entire industries shut down for months on end, while others operated with reduced hours and customer capacities, all under the pressure of supply chain constraints.  Thousands of Americans lost their jobs, had to forgo higher education, and have been crushed by medical bills related to COVID-19 treatments.

*Amici* have witnessed firsthand the economic devastation of the pandemic.  Small businesses, in particular, have faced unprecedented economic hardship.  In surveys of small business owners, nearly a quarter of participants reported that their current sales volume is 50% or less of its pre-pandemic level.  NFIB Research Center, *Covid-19 Small Business Survey (16)* at 9 (Mar. 16, 2021), https://bit.ly/3dv5COz.  And nearly half had employees take pandemic-related sick leave or family leave.  *See id.* at 8.  The hospitality industry was also ravaged, as foodservice sales were down $240 billion from expected levels in 2020.  *See* Nat'l Restaurant Ass'n, *Restaurant Sales Fell to Their Lowest Level Since June* (Jan. 15, 2021), https://bit.ly/3d5gVwu; *see also* Alex Sherman, *Five Charts That Show How COVID-19 Stopped the U.S. Economy In Its Tracks*, CNBC (Mar. 11, 2021), https://cnb.cx/3cZ97O0.  Nearly a third of all restaurant and hospitality workers lost their jobs in the first few months of the pandemic, Erin Huffer & Aravind Boddupalli, *The Leisure & Hospitality Sector Has an Employment Crisis—and It Might Be Getting Worse*, Urban Wire (July 20, 2020), https://urbn.is/397ptlz, and many have yet to return, *see* Nat'l Restaurant Ass'n, *Restaurant Employment Fell for the Third Consecutive Month* (Feb. 5, 2021), https://bit.ly/31b0pG3 (nearly 450,000 restaurant jobs recently lost); Oxford Economic Analysis,

*State-by-State Job Loss: COVID Continues to Devastate Hotel Industry*, Am. Hotel & Lodging Ass'n (Feb. 2021), https://bit.ly/3uG0H47 (hospitality industry unemployment rate 300% higher than rest of economy).  And more than 100,000 businesses of all stripes have permanently shuttered their doors.  Anne Sraders & Lance Lambert, *COVID Business: Nearly 100,000 Establishments That Temporarily Shut Down Are Now Out of Business*, Fortune (Sept. 28, 2020), https://bit.ly/3t6dpci.

These economic hardships not only impact States' residents, but have a direct impact on States' budgets, many of which face dwindling tax revenues alongside rising healthcare costs and record unemployment claims.  *See* Anshu Siripurapu & Jonathan Masters, *How COVID-19 Is Harming State and City Budgets*, Council on Foreign Relations (Mar. 19, 2021), https://on.cfr.org/3f9vjqm.  In Ohio, for instance, private employment over the past year is down 5.4%, or 260,660 jobs.  *State Economic Monitor* (Mar. 26, 2021), https://urbn.is/3d1hsj3.  Indeed, the pandemic is projected to slash state revenues by $200 billion—nearly the exact same amount of money available under the Act.  *See* Lucy Dadayan, *COVID-19 Pandemic Could Slash 2020-21 State Revenues by $200 Billion*, Tax Policy Center (Jul. 1, 2020), https://tpc.io/2NKE8M5.  Even in ordinary times, to refuse such a massive influx of tax dollars would be unthinkable; in these extraordinary times, to do so would border on unconscionable.  The tax mandate thus should be seen—and rejected—as exactly what it is:  an unconstitutional effort to strip States of their core sovereign right to determine their own tax policy.

## II.    Left Standing, The Tax Mandate Will Have Dire Consequences.

Not only is the tax mandate unconstitutional; it threatens immediate and drastic consequences that readily justify the immediate relief of a preliminary injunction.  The mandate's ostensible ban on *any* tax measure that reduces a State's net revenues puts at risk countless critical policies that state lawmakers are seeking to effectuate through their tax codes right now.  The

Supreme Court has long recognized that any "delay" in a State's ability to enforce its tax policies "may derange the operations of government," causing "serious detriment to the public." *Dows*, 78 U.S. at 110. That is as true today as it was 150 years ago. Indeed, if anything, the threat is even more pronounced at this critical juncture in our Nation's history because many of the policies States are pursuing are designed to reduce the financial strain of the pandemic within their respective borders.

Many tax measures in the States would directly reduce the tax burden on businesses, and in particular small businesses and industries that have suffered substantial harm as the result of government-mandated closures and other restrictions. Many of these businesses and their employees are struggling to make ends meet. The ability to reduce their tax burdens is a critical tool in the States' efforts to keep these businesses afloat and restore economic vitality within their borders. For example, New Mexico recently established a gross receipts tax deduction for food and beverage establishments, which were hit particularly hard by pandemic-related closures and restrictions. S.B. 1, 55th Leg., 1st Sess. (N.M. 2021). Maryland recently passed its own sweeping COVID-19 relief bill that, among other things, supports small businesses with a sales tax credit of up to $3,000 per month—a nearly $200 million commitment. S.B. 496, 442d Gen. Assemb., Reg. Sess. (Md. 2021). And California's relief bill includes $2.1 billion for grants to small businesses impacted by the pandemic, as well as fee waivers for the nearly 60,000 restaurants and bars licensed through the State. *See* Office of Gov. Gavin Newsom, *Governor Newsom Signs Legislative Package Providing Urgent Relief to Californians Experiencing Pandemic Hardship* (Feb. 23, 2021), https://bit.ly/2Q6wXOU.

The list goes on. Kansas is considering reimbursing the property tax owed by businesses impacted by closure orders. S.B. 149, 2021 Gen. Assemb., Reg. Sess. (Kan. 2021). That measure

will save myriad businesses whose property tax obligations might otherwise drive them out of business. *See* Holly Wade & Andrew Heritage, *Small Business Problems & Priorities 2020* at Table 1, NFIB Research Center (July 2020), https://bit.ly/3wpWt2g (property taxes and state business income taxes listed as top concerns). The New Hampshire legislature is considering raising the gross income threshold for filing business profits tax returns. S.B. 101, 2021 Gen. Ct., Reg. Sess. (N.H. 2021). Missouri is considering tax credits for businesses that were shut down by local government orders over the past year. H.B. 1406, 101st Gen. Assemb., Reg. Sess. (Mo. 2021). And Texas is considering excluding loans forgiven under the federal Paycheck Protection Program for purposes of state franchise taxes. S.B. 372, 87th Leg., Reg. Sess. (Tex. 2021).

The States' efforts also reach far beyond the business community. Tennessee is considering exempting groceries from sales tax from May to October 2021, to ease families' grocery bills as the pandemic moves well past the one-year mark. H.B. 1071, 112th Gen. Assemb., Reg. Sess. (Tenn. 2021). The bill is projected to save a family of four around $100 a month, but will reduce the State's revenues by more than $20 million. *See Tennessee Bill Would Exempt Groceries from Sales Tax for May Through October 2021*, WBIR (Mar. 18, 2021), https://bit.ly/39tL2wU. New Mexico recently passed a $600 income tax rebate to families and individuals who receive the state's Working Families tax credit. S.B. 1, 55th Leg., 1st Sess. (N.M. 2021). The legislature authorized the rebates earlier this year, and the measure has already cost the State $66 million. Associated Press, *New Mexico To Issue $600 One-Time Tax Rebates Amid Pandemic* (Mar. 24, 2021), https://bit.ly/320cJJv. And Maryland's relief law provides direct stimulus payments to low-income residents—a total of $178 million in relief to 400,000 Marylanders. *See* Office of Gov. Larry Hogan, The RELIEF Act of 2021, https://bit.ly/2O6yoMG.

In addition, many States are considering tax measures that have nothing to do with COVID-19 relief, but that are manifestly in the public interest.  For instance, Georgia recently extended tax credits for families who adopt a child out of foster care, to become effective on July 1, 2021.  *See* H.B. 114, 156th Gen. Assemb., Reg. Sess. (Ga. 2021).  Missouri is considering the same.  *See* H.B. 429, 101st Gen. Assemb., 1st Reg. Sess. (Mo. 2021).  Alabama is considering tax deductions that would enable citizens to purchase storm shelters to protect their families from tornadoes.  *See* H.B. 227, 2021 Leg., Reg. Sess. (Ala. 2021).  Montana is considering increasing its current education tax credit for families.  *See* H.B. 279, 67th Leg., Reg. Sess. (Mont. 2021).  And West Virginia is considering extending its tax credit for charitable organizations that invest in local communities. S.B. 446, 85th Gen. Assemb., Reg. Sess. (W. Va. 2021).  Given its most natural construction, the tax mandate would implicate all of these measures.

To be sure, the Treasury Department has tried to assure States that the mandate need not be read so broadly, claiming that States remain "free to make policy decisions to cut taxes" so long as they do not "use the pandemic relief funds to pay for those tax cuts."  Davison, *supra* p.6 (quoting Treasury spokesperson); Letter from Janet L. Yellen to Hon. Mark Brnovich, Attorney General (Mar. 23, 2021); *see also* Press Release, *Statement on State Fiscal Recovery Funds and Tax Conformity*, U.S. Dep't of Treasury (Apr. 7, 2021).  But when pressed on what that actually means in a world where money is fungible and tax cuts are not "paid for," the way a new highway might be, the Treasury Secretary admitted that the issue is "thorny."  Hearing on CARES Act Quarterly Report, Sen. Banking, Hous. & Urb. Affairs Comm. (Mar. 24, 2021) (testimony of Sec'y Yellen).  Given the Act's bar on using the relief funds even to "indirectly" effect a revenue decrease and the "fungibility of money," the Secretary conceded that it is "hard … to answer" exactly how much ARPA may "hamstr[i]ng" the States.  *Id.* (exchange between Sec'y Yellen and Sen. Crapo).

13

That alone is a fatal problem, as Congress must impose any conditions on the States' receipt of federal funds "unambiguously[,] enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation."  *Dole*, 483 U.S. at 207; *see also Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (requiring "clear notice" of conditions).  But even setting the ambiguity problem aside, States have no time to wait for Treasury to decide if and how it may try to interpret the mandate more narrowly (if such a narrowing construction is even possible).  States are confronted with pressing public policy issues *now*, and many are on the clock.  In the overwhelming majority of States, state constitutions and/or statutes limit how long the legislature can be in session, and most require the legislature to balance the budget during the prescribed time.  *See* Nat'l Ass'n of State Budget Officers, *Budget Processes in the States* at T.1 (2015), https://bit.ly/3dNTfNR.

Alabama provides an example.  Its session commenced on February 2 and must conclude by May 18.  The legislature thus must decide in a matter of weeks whether to pass a tax deduction for storm shelters—an issue of critical import after a recent tornado devastated part of the State.  *See* Vanessa Romo et al., *Tornadoes Strike Alabama, Georgia Leaving at Least 5 Dead*, NPR (Mar. 26, 2021), https://n.pr/2PpDZ1f.  Tennessee is under an even tighter timeline.  Its general session concludes on April 30, by which time it must give an up or down vote on its sales tax exemption for groceries.  These States and many others cannot wait for Treasury to make up its mind; they need to have a clear understanding that they may continue to exercise their sovereign prerogative to reduce taxes.

It is difficult to see how the federal government has *any* legitimate interest in prohibiting States from lowering the tax burden on their residents.  But even assuming some such interest may exist, the balance of equities would plainly weigh in favor of injunctive relief.  The tax mandate

was an eleventh-hour addition to the bill, with no formal legislative history to speak of.  *See* Patrick Gleason, *How Senator Joe Manchin's Move To Block Tax Relief in His Own State Costs All U.S. Taxpayers*, Forbes (Mar. 16, 2021), https://bit.ly/31vV782.  Congress did not even bother to explain why it chose to rush in where two centuries of previous congresses feared to tread.  The whole point of ARPA is to provide economic relief to critical sectors of American society that were hit especially hard by the pandemic.  *See* Pub. L. 117-2 §9901(c)(1)(A); Press Release, *President Biden Announces American Rescue Plan*, White House (Jan. 20, 2021), https://bit.ly/3f4S5Qe.  Tax relief is an obvious means of achieving that policy objective, yet Congress placed it off limits.  *Cf. City of Phila. v. Sessions*, 280 F. Supp. 3d 579, 657 (E.D. Pa. 2017) (finding it meaningful that requiring the city to forgo funds would prevent the city from addressing the opioid epidemic, which the Trump Administration had described as "a major public health crisis").  And that is to say nothing of how Congress could possibly have an interest in halting myriad non-COVID-19-related tax measures that undoubtedly will benefit Americans and American businesses at a time when they need it most.  In short, even assuming there are some equities on the other side of the ledger, the balance is not even close.

## CONCLUSION

For the reasons set forth above, this Court should grant Missouri's motion for a preliminary injunction.

15

Respectfully submitted,

DARYL JOSEFFER #457185DC
PAUL LETTOW #502440DC
U.S. CHAMBER LITIGATION CENTER
1615 H Street NW
Washington, DC 20062
(202) 463-5337


KAREN HARNED #456803DC
ROB SMITH #84259MI
NFIB SMALL BUSINESS LEGAL CENTER
1201 F Street NW #200
Washington, DC 20004
(202) 314-2061

s/Paul D. Clement
PAUL D. CLEMENT, #37915VA
ERIN E. MURPHY, #995953DC
KASDIN M. MITCHELL, #1602380DC
LAURA E. WOLK, #1643193DC
ELIZABETH HEDGES, #1657707DC
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
Washington, DC 20004
(202) 389-5000


April 15, 2021

16

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of April, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Missouri using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Paul D. Clement</u>
Paul D. Clement