UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:21CV376 HEA |
| | ) | |
| JANET YELLEN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Plaintiff's Motion for Preliminary Injunction, [Doc. No. 6]. The matter is fully briefed, and the court conducted a hearing on the Motion on May 4, 2021. After a thorough review of the pleadings and for the reasons discussed below, Plaintiff lacks standing, and this matter is not ripe for adjudication. The case will be dismissed for lack of jurisdiction.

### Facts and Background

Plaintiff State of Missouri brought this case challenging "the threatened unconstitutional application" of section 9901 of the American Rescue Plan Act of 2021, Pub. L. No. 117-2, § 9901 (codified at 42 U.S.C. §§ 802-805) (the "ARPA"). The ARPA's "Coronavirus State Fiscal Recovery Fund" allocates almost $220 billion "for making payments under this section to States, territories, and Tribal governments to mitigate the fiscal effects stemming from the public health

emergency with respect to the Coronavirus Disease (COVID–19)," with $195.3 billion reserved for the States and District of Columbia. 42 U.S.C. § 802(a)(1). Missouri estimates that it will receive almost $2.8 billion under ARPA, which represents about 14% of Missouri's general expenditures and is "sorely needed" as the state works through the COVID-19 pandemic.

The ARPA provides that through December 31, 2024, a State may use the recovery funds "to cover costs incurred":

(A) to respond to the public health emergency with respect to the COVID–19 or its negative economic impacts, including assistance to households, small businesses, and nonprofits, or aid to impacted industries such as tourism, travel, and hospitality;

(B) to respond to workers performing essential work during the COVID–19 public health emergency by providing premium pay to eligible workers of the State, territory, or Tribal government that are performing such essential work, or by providing grants to eligible employers that have eligible workers who perform essential work;

(C) for the provision of government services to the extent of the reduction in revenue of such State, territory, or Tribal government due to the COVID– 19 public health emergency relative to revenues collected in the most recent full fiscal year of the State, territory, or Tribal government prior to the emergency; or

(D) to make necessary investments in water, sewer, or broadband infrastructure.

*Id.* § 802(c)(1).

Section 802(c)(2)(A) of the ARPA prohibits a State from using the relief funds to "directly or indirectly offset a reduction in net tax revenue of such State [ ]

- 2 -

resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise)," (the "Offset Restriction"). In the event a State does not comply with the Offset Restriction, it "shall be required to repay to the Secretary [of the Treasury] an amount equal to the amount of funds used in violation [thereof]." *Id.* § 802(e).

Missouri contends that two interpretations of the Offset Restriction exist, one correct and the other representing an unconstitutional intrusion by the federal government upon the States' sovereign power to set their own tax policies. The narrow interpretation only prohibits a state from taking COVID-19 recovery funds and deliberately applying them to offset a specific tax reduction of a similar amount; this is the interpretation Missouri argues is correct. The second, broad interpretation would prohibit a State from enacting any tax-reduction policy that would result in a net reduction of revenue through 2024 or risk forfeiting its COVID-19 relief funds. Missouri argues that application of the broad interpretation would allow the federal government to coerce States to adopt federal rules and policy and to commandeer the States' taxing authority, in violation of the Tenth Amendment.

Missouri argues that some U.S. Senators have endorsed the broad

interpretation of the Offset Restriction and that Defendant Secretary of the Treasury Janet Yellen has "carefully left open" the potential application of the broad interpretation. On March 16, 2021, the Attorneys General of Missouri and 20 other States sent a letter to Secretary Yellen, seeking her guarantee that the Department of the Treasury would apply the narrow interpretation to the Offset Restriction. On March 23, 2021, Secretary Yellen responded with a letter that Missouri reads as "declin[ing] to endorse the narrow and correct interpretation of the Tax Mandate" and "le[aving] open the possibility that the Department of the Treasury might require States receiving federal aid to 'replac[e] lost revenue by other means' if they choose to enact tax cuts." Missouri alleges that Secretary Yellen's response generates uncertainty, confusion, and doubt for the Missouri state legislature, which is currently considering and debating tax-reduction policies. The uncertainty and the possibility of the Treasury Department imposing the broad interpretation, Missouri argues, "threatens grave, immediate, and irreparable injury to the State of Missouri."

In their response to Missouri's motion for preliminary injunction, the Defendants (Secretary Yellen, along with Inspector General of the Department of the Treasury Richard Delmar and the Department of the Treasury) assert that the basis of Missouri's argument – the belief that the Treasury is poised to implement

the broad interpretation of the Offset Restriction – is an "incorrect premise." The

Defendants argue that the ARPA affords States considerable flexibility in setting

their tax policies. Of the Offset Restriction, Defendants state:

> By its plain text, the offset provision addresses only a reduction in a
> State's "*net* tax revenues." 42 U.S.C. § 802(c)(2)(A) (emphasis
> added). A State is thus free to change its tax law as it believes
> appropriate, cutting some taxes and increasing others. And even if a
> State chooses to make changes that result in a reduction in net tax
> revenue, the Act bars a State only from using Rescue Plan funds—as
> opposed to other means—to offset that reduction. *Id.* The Act also
> makes clear that if a State chooses to use Rescue Plan funds to offset a
> reduction in net tax revenue resulting from changes in state law, the
> only consequence would be a loss of monies commensurate with the
> amount of federal funding used for that offset. *See id.* § 802(e).

Defendants argue that Missouri does not have standing to challenge the

Offset Restriction because it has not enacted or alleged any hypothetical tax cut

that would decrease net tax revenues, nor has Missouri alleged that it plans to use

federal recovery funds in a way that would violate the ARPA. Defendants also

argue that Missouri's challenge to the ARPA is not ripe because Missouri has not

alleged conduct that has resulted in recoupment and the Department of the

Treasury has not indicated an imminent plan to recoup funds from Missouri.

## Legal Standard

Article III of the Constitution limits the jurisdiction of federal courts to

"Cases" and "Controversies." U.S. Const., Art. III, § 2. "Article III standing is a

threshold question in every federal court case." *United States v. One Lincoln Navigator 1998*, 328 F .3d 1011, 1013 (8th Cir. 2003). The "irreducible constitutional minimum" of standing consists of three elements. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id*. The Supreme Court has explained that the injury in fact requirement means showing "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citations and quotation omitted). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis in original). "[T]hreatened injury must be *certainly impending* to constitute injury in fact, . . . allegations of *possible* future injury" are not sufficient." *Id.*

"The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the

powers of the political branches." *Id.* at 408. "Proper respect for a coordinate branch of the government requires that we strike down an Act of Congress only if the lack of constitutional authority to pass the act in question is clearly demonstrated." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012) (internal quotation omitted). When a lawsuit seeks pre-enforcement review of a threatened government action, "a plaintiff satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).

"The party invoking federal jurisdiction bears the burden of establishing standing." *Id.* at 158. "Each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Id.*

## Discussion

Missouri asks the Court to enjoin Defendants from enforcing any interpretation of the Offset Restriction that is broader than the narrow interpretation it advances and endorses. Missouri has failed to establish Article III standing or ripeness, especially considering that Missouri requests the Court

preemptively bind its coordinate branches of government and the elected leaders of this Nation. See *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 537-38 ("Members of this Court are vested with the authority to interpret the law; we possess neither the expertise nor the prerogative to make policy judgments. Those decisions are entrusted to our Nation's elected leaders, who can be thrown out of office if the people disagree with them. It is not our job to protect the people from the consequences of their political choices.").

**Standing**

Missouri lacks standing because it has not shown that it has suffered an injury-in-fact. This determination is based on the three injury-in-fact requirements for pre-enforcement review of a threatened government action as set out in *Susan B. Anthony List*: (1) plaintiff alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, (2) but proscribed by a statute, and (3) there exists a credible threat of prosecution thereunder. 573 U.S. at 159.

To the extent that Missouri alleges that its legislature intends to pass[1] tax-cut litigation, it has demonstrated an intention to engage in a course of conduct arguably affected with a State's constitutional interest in setting in its own tax

---

1 This Court does not suggest that the legislature's mere proposal and discussion of such legislation satisfies the first pre-enforcement standing prong.

policy. However, in its reply memorandum, Missouri cites "cutting taxes *and*
accepting [ARPA] funds" as the conduct forming the first injury-in-fact
requirement. (Emphasis added). Missouri does not have a constitutional interest in
accepting ARPA funds. Its reliance on *City and County of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018) for its contention that a scenario in which a State
must choose between a state policy or federal funds constitutes injury-in-fact is
misplaced. The *San Francisco* plaintiffs challenged an Executive Order that
directed Executive Agency heads to refuse to disperse federal grants to any
"sanctuary" jurisdictions. These federal grants represented money that was
appropriated for the jurisdictions by acts of Congress. The Ninth Circuit stated that
a "loss of funds *promised* under federal law satisfies Article III's standing
requirement." 897 F.3d at 1235 (internal quotation marks and punctuation omitted)
(emphasis added).

      The facts of the instant case are readily and boldly distinguishable. The
ARPA recovery funds were not "promised" to Missouri by Congress, then taken
away by some other act of Congress or the Executive Branch. Rather, in passing
the ARPA, Congress both appropriated recovery funds and placed a condition on a
State's receipt of the funds. See *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 537 ("[I]n
exercising its spending power, Congress may offer funds to the States, and may

condition those offers on compliance with specified conditions."). Therefore,

Missouri's interest in accepting the ARPA recovery funds does not establish

standing and is not relevant to the injury-in-fact analysis.

Proceeding with Missouri's interest in setting its own tax policy, the second

injury-in-fact requirement is not met. The ARPA does not prohibit States from

proposing, enacting, or implementing legislation that cuts taxes for its citizens and

businesses. As Defendants state in their memorandum in opposition to Missouri's

motion:

> [T]o ensure that the new federal funds are used for those purposes and
> not others Congress chose not to support, the [ARPA] requires a State
> to agree that it will not use the federal funds to offset a reduction in
> net tax revenue resulting from changes to state law. The Rescue Plan
> does not prohibit a State from cutting taxes; it merely restricts a
> State's ability to use *federal funds* distributed under the [ARPA] to
> offset a reduction in net tax revenue. No State has a sovereign interest
> in using federal funds for that purpose.

(Emphasis in original). In short, State tax cuts are not proscribed by the ARPA.

Missouri's sovereign power to set its own tax policy is not implicated by the

ARPA. The Missouri legislature is free to propose and pass tax cuts as it sees fit.

Relatedly, the third requirement for injury-in-fact, a credible threat of

prosecution, is not met. Because the ARPA does not prohibit a State from

implementing its own tax policy, Missouri does not face a credible threat of

prosecution if it decides to pass tax cutting measures. Missouri disagrees, arguing

that they stand to lose billions of federal recovery dollars if the State legislature enacts legislation that results in a net revenue reduction. However, recoupment is not triggered by a reduction in State tax revenue, it is triggered by a State's use of federal recovery fund to offset a reduction in its net tax revenue. Again, Missouri's ability to set its own tax policy is not implicated.

Missouri has not alleged an injury-in-fact and therefore does not have Article III standing to bring the lawsuit. Additionally, this case is not ripe.

**Ripeness**

It is axiomatic that "[r]ipeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.' " *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–149 (1967)). "A party seeking review must show both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 867 (8th Cir. 2013) (internal quotation omitted). "Both of these factors are weighed on a sliding scale, but each must be satisfied to at least a

minimal degree." *Id.* (internal quotation omitted).

In *Texas v. United States*, 523 U.S. 296 (1998), Texas had sought administrative preclearance of a statute as required by Section 5 of the Voting Rights Act. The United States Assistant Attorney General in charge of preclearance did not object to two sections of the Texas statute, but cautioned that "under certain foreseeable circumstances their implementation may result in a violation of Section 5 which would require preclearance." *Id.* at 298-99. Texas filed suit seeking a declaration that Section 5 did not apply to the two sections of the Texas statute. *Id.* at 299. The Supreme Court held that Texas's claim was not ripe. *Id.* First, the claim impermissibly "rest[ed] upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.' " *Id.* at 300 (quoting *Thomas v. Union Carbide Agricultural Products Co.,* 473 U.S. 568, 580–581 (1985)). Next, the issue was not fit for judicial decision because "determination of the scope ... of legislation in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract an inquiry for the proper exercise of the judicial function." *Texas*, 523 U.S. at 301 (ellipsis in original). As to hardship to the parties, the Supreme Court noted that "Texas [was] not required to engage in, or to refrain from, any conduct, unless and until it chooses to implement one of the noncleared remedies." *Id.* The Supreme Court even

- 12 -

suggested that "[i]f Texas is confident that" the implementation of a noncleared remedy did not violate Section 5, "it should simply go ahead" with the implementation. *Id.* at 301-2. Finally, the Supreme Court held that "a threat to federalism" was an abstraction inadequate to support suit. *Id.* at 302.

The Supreme Court's findings in *Texas* are instructive here. As in *Texas*, Missouri's claim is based upon contingent future events that may not occur. These contingencies include: the passage of tax cuts by the State legislature, a decrease in net revenue due to those tax cuts, and the Department of the Treasury's recoupment of funds based on a broad interpretation of the Offset Provision. Notably, Defendants, through counsel, have explicitly asserted that they do not agree with the "broad interpretation" proposed by Missouri, Hr'g Tr. 19:5-11 [Doc. No. 27], further attenuating Missouri's claim of the "threatened" broad interpretation.

As to fitness for review, Missouri asks the Court to determine the scope of the ARPA's Offset Restriction well in advance of any adverse effect and in a wholly, non-actionable hypothetical context. As in *Texas*, Missouri's request "involves too remote and abstract an inquiry for the proper exercise of the judicial function." 523 U.S. at 301. Additionally, "fitness rests primarily on whether a case would 'benefit from further factual development,' and therefore cases presenting

purely legal questions are more likely to be fit for judicial review." *Id.* (quoting

*Pub. Water Supply Dist. No. 10 of Cass Cnty. v. City of Peculiar,* 345 F.3d 570,

573 (8th Cir. 2003). Although Missouri asserts that this action presents the purely

legal question of the correct interpretation of the Offset Restriction, it is readily

apparent that this case would benefit from further factual development. For

example, the Treasury Department has not yet promulgated regulations interpreting

the ARPA's Offset Restriction. It is premature for the Court to interfere before

Treasury can even promulgate regulations, much less have those regulation affect

Missouri "in a concrete way." See *Nat'l Park Hosp. Ass'n*, 538 U.S. at 807–08.

 The Court also finds that the hardship to the parties factor weighs against

ripeness. The Offset Restriction does not require Missouri to engage in, or refrain

from, any conduct, including legislative conduct regarding tax policy. The alleged

infringement on Missouri's sovereign right to set its own tax policy is an

abstraction inadequate to support suit, since the Offset Restriction does not touch

Missouri's "primary conduct." *Texas*, 523 U.S. at 301. Moreover, "[a]bstract injury

is not enough [to satisfy the "hardship" factor]. It must be alleged that the plaintiff

has sustained or is immediately in danger of sustaining some direct injury as the

result of the challenged statute or official conduct." *Pub. Water Supply Dist.*, 345

F.3d at 573. Missouri's purported injuries to legislative proceedings and the

prospect of recoupment of federal recovery funds are too abstract and remote to constitute significant hardship. Missouri's claim is not ripe for adjudication.

## Conclusion

This Court lacks jurisdiction to hear this case. Missouri has failed to establish Article III standing, and its claim is not ripe for adjudication. The alleged harm to Missouri is too speculative, abstract, and remote to establish justiciability. The case will be dismissed.

Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that this action is **DISMISSED.**

Dated this 11th day of May, 2021.


_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE